### EVANS et al. v. PITTOCK et al.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1912.)

No. 2,000.

LANDLORD AND TENANT (§ 112*)—RIGHT TO CANCELLATION OF LEASE—DECLARATION OF FORFEITURE.

Complainants leased to defendants a block of ground in Portland, Or., for a term of over 100 years at a rental of $30.000 annually for the first 10 years. Defendants convenanted to pay all taxes and assessments and to construct a building on the property, commencing the following year, to cost not less than $500,000. Some 2½ years later complainants served a notice of forfeiture for default in accordance with the terms of the lease, and 60 days afterward declared a forfeiture, and, being in possession, brought suit for a cancellation of the lease as a cloud on their title. It was admitted that the building had not been commenced; that complainants had been compelled to pay the taxes to prevent a sale of the property therefor; and that the rent was in default to an amount exceeding $50,000. Defendants set up as a defense a parol agreement alleged to have been made three months prior to the notice by which they were given an extension of nine months to pay up arrears and commence the building, and that complainants at that time refused to cancel the lease. *Held*, on a consideration of the evidence, that such agreement was not established, and that complainants were entitled to a cancellation of the lease.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 343–349; Dec. Dig. § 112.*]

Appeal from the Circuit Court of the United States for the District of Oregon.

Suit in equity by H. L. Pittock and Georgiana Pittock against J. Whyte Evans and W. D. Wood. Decree for complainants, and defendants appeal. Affirmed.

The appellees were complainants in the court below, and by their bill sought to obtain a decree canceling a certain written lease and directing the defendants to the suit, who are the appellants here, to surrender the lease for cancellation.

The bill alleged that on the 23d of February, 1907, the complainants were the owners in fee of a certain block of land in the city of Portland, Or., known as block numbered 215, and leased the same to the defendant Evans for the period extending from February 1, 1907, to December 31, 2005, at agreed specified rentals payable in monthly installments in advance, which rentals aggregated $30.000 per year from February 1, 1907 to January 1, 1917, and gradually increased for different specified periods, reaching the aggregate sum of $103,568.10 per year from January 1, 1997, to December 31, 2005, in addition to the agreed payment by the lessee during the entire term of "all rates, taxes, charges and assessments for revenue and otherwise, general and special, ordinary and extraordinary of every nature and kind whatsoever, including water rates, which may be taxed, charged, assessed, levied or imposed during the continuance of said lease on the premises therein demised, and upon any and all buildings or improvements thereon of any kind which were then upon or which might after the date of said lease and before its expira-

tion be erected, made or placed upon said demised premises, and upon the leasehold estate granted in said lease," and that the lessee "would keep said property free from all liens of every kind and description that may have priority over the title or interest of the lessors, and that a failure to pay and discharge any delinquent liens within sixty (60) days after demand for payment thereof made after delinquency by the lessors or their successors in interest, should be deemed a breach of covenant under 'said lease, and the lessors might at their option then terminate said lease."

The bill alleged that the agreement of lease contained this, among other, covenants:

"Fourth. The lessee further covenants and agrees to and with the lessors to erect, finish and complete upon said premises, at his own expense, a substantial, first-class, fireproof building or buildings, of steel or reinforced concrete construction, or a combination thereof, of the aggregate value of not less than $500,000.00, the construction of said building or buildings to be commenced on or before the 1st day of July, 1908, and to be prosecuted continuously and diligently until the completion thereof, without interruption or delay save and except such interruptions or delays as may be caused by strikes, unavoidable delays in the securing or transportation of materials, delays resulting from the action of the elements or weather, or by any unavoidable casualty; said building or buildings as constructed to become security for the payment of the rent accruing under the terms of this lease, and for the fulfillment of all the conditions and covenants herein contained." The lease further provided that, upon its expiration or other determination of the same, "all buildings, fixtures, and improvements then situated upon said premises should belong to and be the property of the said lessors without any payment therefor by them, and that the lessee would convey said building or buildings by good and sufficient conveyance to the lessors"; that no limitation should exist upon the right of the lessee or his successors to assign the lease or to sublet the whole or any part of the premises, with certain limitations not necessary to be stated; that all rents accruing under the lease and all proper advancements and payments made by the lessors thereunder "should be a first lien upon any and all buildings and improvements placed upon said premises at any time during the term of said lease and upon the leasehold estate created by said lease and upon the rents of all buildings and improvements placed or situated on said leased premises at any time during the term of said lease."

The bill then set out the twenty-third, twenty-fourth, and twenty-fifth paragraphs of the lease, as follows:

"Twenty-Third. It is further understood and agreed that time is deemed and made the essence of this lease, and, if default shall be made in any or either of the covenants herein contained to be kept by the said lessee and such default shall continue for sixty (60) days after notice thereof in writing by the said lessors to the said lessee, then and in case of such default the said lessors may at their election declare said lease terminated, and may re-enter said demised premises or any part thereof either with or without process of law, and may remove and expel from said premises the said lessee and any and all persons occupying the same, and repossess and enjoy the said premises as of their former estate, and if, at any time, said lease shall be ended at such election, of the said lessors as aforesaid, the said lessee does hereby covenant and agree to surrender and deliver up said above-described premises with all buildings and improvements situated thereon, peaceably to said lessors, immediately upon the termination of said lease as aforesaid and without any compensation being paid for any buildings or improvements placed thereon.

"Twenty-Fourth. It is hereby agreed that no waiver of a breach of any covenant or provision of this lease shall be construed to be a waiver of any succeeding breach of the same or any covenant or provision thereof.

"Twenty-Fifth. It is hereby mutually agreed that each of the expressions, phrases, terms, conditions, provisions, stipulations, agreements, and obligations of this lease shall extend to and bind or inure to the benefit of, as the case may be or require, not only the parties hereto, but each and every of the heirs, executors, administrators, assigns and successors of the respective parties hereto, and wherever in this lease a reference to either of the parties hereto is made, such reference shall be deemed to include, wherever applicable, also a

reference to the heirs, executors, administrators, assigns and successors of such party, the same as if in every case expressed, and all the conditions and covenants contained in this lease shall be construed as covenants running with the land."

Due execution and recording of the lease is then alleged, as well as its assignment in the year 1907 by Evans to the defendant Wood. It is then alleged that the defendants have failed, neglected, and refused to commence the construction of any building upon the leased premises or to take any steps towards such construction; that they have failed, neglected, and refused to pay any part of the rentals provided for in the lease "except the rentals falling due prior to September 1st, 1907, and the sum of $10,000.00 subsequently paid upon account"; that they have failed, neglected, and refused to pay the taxes assessed upon the premises for the years 1907 and 1908, amounting to $13,450.50, which amount the complainants were compelled to and did pay to prevent a sale of the premises for delinquent taxes. The eighth, ninth, and tenth clauses of the bill are as follows:

"(8) That on the 10th day of August, 1909, in accordance with the provisions of said lease, plaintiffs gave notice in writing to the defendant W. D. Wood that default had been made in the covenants of said written agreement of lease to be kept and performed by the lessee named therein, and that if such default should continue for sixty (60) days thereafter that plaintiffs would declare said lease terminated; that notwithstanding said notice in writing a default in the covenants of said lease referred to in said notice has continued, and that no attempt has been made on the part of either of the defendants herein to carry out the provisions and covenants of said lease, but, on the contrary, further default has been made in the payment of taxes assessed against said leased premises.

"(9) That plaintiffs have declared said written agreement of lease terminated, and are now occupying said premises as of their former estate.

"(10) That no possession of said premises was ever taken by the defendants or any one under said lease, but that notwithstanding that fact and the default, and failure, neglect, and refusal of the defendants in carrying out the covenants of said lease, said defendants claim some interest in and to said leased premises under and by virtue of said lease adverse to the plaintiffs, which said lease is in the possession of the defendant W. D. Wood and constitutes a cloud upon plaintiffs' title to the real property hereinbefore described."

No question is made by the answer of the defendants as to the ownership in fee by the complainants of the leased premises, nor in respect to the execution of the lease, a copy of which is annexed to and made a part of the answer, nor of its assignment by Evans to Wood.

The eighth paragraph of the answer is as follows:

"(8) For answer unto paragraph 8 of the complaint, this defendant (Wood) admits that on the 10th day of August, 1909, the plaintiffs gave a notice in writing to the defendant W. D. Wood that certain defaults had been made in the covenants of said written agreement of lease to be kept and performed by the lessee named therein, and that if such default should continue for 60 days that plaintiffs would declare said lease terminated, but the defendant Wood denies that there was any default, or that, notwithstanding said notice in writing, the default in the covenants in said lease referred to in said notice occurred or has continued, and this defendant denies that no attempt has been made on the part of either of the defendants herein to carry out the provisions in the covenants of said lease, but this defendant admits that the assessment of general taxes against the said property has not in fact been paid by either defendant, and defendant alleges the truth to be as is hereinafter more particularly set forth in articles 11 to 17 of this answer, both inclusive."

Paragraphs 11 to 17 of the answer, both inclusive, are as follows:

"(11) And, further answering plaintiffs' complaint herein, defendant alleges the truth and the facts to be as follows: That by and under paragraph fourteenth of said agreement of lease hereto annexed as Appendix 'A,' and specially referred to, it was provided as follows: 'Fourteenth. The lessee shall on or before the 15th day of July, 1907, file with the lessors a bond in the amount of $150,000 with good and sufficient surety or sureties conditioned that the said

lessee, his assigns or legal representatives, will construct a building or buildings upon said premises within the period and of the kind herein provided, and will protect said property from any liens, claims or demands on account of material or labor and all demands of every kind and description on account of the construction thereof and pay the rental herein provided to be paid until the completion of said building and possession of said property shall be delivered to the lessee or his assigns upon the filing of said bond with the lessors.' The defendant Wood avers that the bond mentioned in the said paragraph of the lease above set forth was duly and properly executed by the defendant W. D. Wood with the Trustee Securities Company, a corporation, as surety; that the said the Trustee Securities Company are a good and sufficient surety, and that the said surety was satisfactory to and approved by the plaintiffs herein, and that the said bond, after being properly signed, sealed, witnessed, and executed and approved by the defendant Wood and the Trustee Securities Company, was duly delivered and accepted by the plaintiffs herein on July 10, 1907, and approved by them on July 16, 1907; that by the terms of the provisions of the lease hereto annexed as 'Appendix A,' and specially referred to, it was incumbent on the plaintiffs upon the execution and delivery of the said bond to deliver possession of said property to the lessee or his assigns, but this defendant has never been put in possession of said property. Neither has possession been tendered to him, but, on the contrary, the plaintiffs and each of them have wholly failed and neglected, and ever since have wholly failed and neglected, to deliver possession of the said premises to the defendant or to any one in his behalf, but, on the contrary, the said plaintiffs continued to hold and now hold possession of the said premises. The defendant W. D. Wood avers that the plaintiffs herein have since July 10, 1907, occupied and still occupy said premises as their sole and only family residence; that the plaintiffs have since July 10, 1907, maintained fences around all of the said premises, and have continuously and exclusively inclosed the same during all of the time since said date, to wit, July 10, 1907, occupied, cultivated, and used said premises and the whole thereof, except that portion occupied by other buildings as hereinafter set forth, as a garden, orchard, and lawn. The defendant W. D. Wood avers that, in addition to the residence building occupied by the said plaintiffs on said premises as above set forth, there has been on said premises ever since July 10, 1907, and there now is, the additional residence building which this defendant alleges upon information and belief has been ever since said date, to wit, July 10, 1907, leased by said plaintiffs to other parties unknown to this defendant for a valuable consideration unknown to this defendant, which valuable consideration has been received and retained by the plaintiffs herein. This defendant further avers that the plaintiffs have made no accounting; neither have they offered to make an accounting for the value and use of the said premises since July 10, 1907, but, on the contrary, have retained and controlled the said premises to their exclusive use and enjoyment, and have received and accepted all of the profits accruing from the said premises since July 10, 1907, without any accounting therefor to the defendant W. D. Wood.

"(12) That by and under the terms of said agreement of lease hereinafter more specifically set out and attached hereto as 'Appendix A,' and specially referred to, it was provided by paragraph seventeenth as follows: 'Seventeenth. It is further understood that the lessors shall have the privilege of removing, at their own cost, any building or buildings now upon said premises as they may desire or any other material therefrom, or any of the trees or shrubbery thereon, but that such removal shall be made so as not to interfere with the excavation for the foundation of the building or buildings to be constructed upon said premises.' This defendant avers that by and under the paragraph in the lease above set forth the plaintiffs herein reserved the right to and were given the privilege of removing the buildings, trees, and shrubbery from the said premises, but these plaintiffs have never waived their said right in the premises, nor have they removed said buildings, trees, or shrubbery, but, on the contrary, the buildings, trees, and shrubbery are in the same condition and position that they were at the time of the execution of the said lease, and it would not be possible to remove said shrubbery except in the spring of the year for purposes of replanting, and the plaintiffs herein have never put the premises in such condition as is called for by the above

paragraph of the lease so as to deliver possession of the said premises as was in this lease contemplated.

"(13) This defendant further alleges that since, to wit, the year 1908, inclusive, that he has been greatly interested and engaged in and that he is constructing in the city of Portland, Or., a large and costly building called the Olds, Wortman & King Building, and that he is now at this time engaged and occupied in constructing and erecting the said building; that the said Olds, Wortman & King Building is a large five-story building covering a whole block of property bounded by Morrison street, Tenth street, Alder street, and West Park street, all in said city of Portland, county of Multnomah and state of Oregon, and that said building is of costly construction; that the defendant herein, W. D. Wood, was greatly occupied in the financing, construction, and erection of the said Olds, Wortman & King Building, as plaintiffs well knew; that the years 1907, 1908, and part of 1909 were years of panic and financial stringency, and because of this fact and because of the construction of the said Olds, Wortman & King Building the said W. D. Wood, to wit, on December 28, 1908, and the 13th day of May, 1909, offered to the plaintiffs to release the plaintiffs herein from the said agreement of lease on the said described property, to wit, block 215 in the city of Portland, county of Multnomah and state of Oregon, and the defendant offered to cancel said lease, but the plaintiffs and each of them refused to cancel said lease, but, on the contrary, knowing of the financial stringency and the burdens upon W. D. Wood as aforesaid, elected and agreed to continue said lease and to treat the same as of full force and effect except as to the conditions of time of performance, and to demand the payments due thereunder, but at no time offered to put defendants or either of them into possession, but, on the contrary, these plaintiffs have held and now continue to hold exclusive possession of the said premises, and these plaintiffs continue to enjoy and now enjoy the exclusive use and profits of said property.

"(14) That on the 9th day of August, 1909, the plaintiffs herein served on the defendant W. D. Wood a notice in writing that unless defendant completed and performed certain covenants of the lease, including the erection of the building in said lease provided for, within 60 days from the date of said notice that suit would be begun to terminate all of the rights which the defendant had in the said leased property herein more particularly described, and to cancel the said agreement of lease; that, by the terms of the said written agreement of lease, it was provided, among other things, that the building or buildings specified in said lease to be erected by the lessee was to be of fireproof construction and to be of the value at least equal to $500,-000, and this defendant alleges that the notice and demand for the erection of such a building within 60 days, as specified in the notice and demand above described, was entirely inequitable, unreasonable, and physically impossible of accomplishment within the time specified and limited by the notice. This defendant further avers that the notice above described was not served, neither was this suit begun in good faith, but was intended to surprise this defendant and force upon him a cancellation of said lease and a forfeiture of the moneys paid to the plaintiffs thereunder, and plaintiffs so moved against defendant Wood because times have improved and Portland real estate values have suddenly greatly arisen, and plaintiffs had encouraged defendants to continue under the burden of said lease during dull times, but sought to suddenly enforce a forfeiture of said lease that plaintiffs might reap the profit and advantage of said increased values, and the commencement of this suit was intended to injure the credit of the defendant, and by the public notoriety and general knowledge of the public at large of the fact of the said suit to embarrass the defendant in the construction of the said Olds, Wortman & King Building did injure the credit of the defendant, and caused much delay and complications in the conduct of defendant's other business interests, and more particularly in the erection, construction, and completion of the Olds, Wortman & King Building, so that defendant Wood has been and is damaged in the sum of $50,000.

"(15) This defendant avers that block 215 in the city of Portland is property situated in the midst of the active retail district of the said city, and that, owing to the increasing population of the city of Portland and the enlargement of the retail business district of said city, the value of the said

property, to wit, block 215 in the city of Portland, had, to wit, on October 21, 1909, suddenly and greatly increased in value at the time of the commencement of this suit, and that said property is now worth nearly double the amount of its estimated value at the time that the said lease herein more particularly set out was entered into; that, as aforesaid, plaintiffs have acquiesced in all things done by defendant and refused to release defendant, and, as aforesaid, the purpose of this suit is by surprise and sudden and inequitable advantage taken of the defendant to now deprive the defendant of the advantages of the said lease and cause him to forfeit and lose the valuable rights acquired under said lease, and to forfeit and lose the large sums of money which have been paid to the plaintiffs herein by defendant on account of said lease and accepted by said plaintiffs as sufficient performance by defendant on account of those things by him to be performed under said lease; that the plaintiffs refused, as aforesaid, to release this defendant from the terms and effect of said lease or to cancel the same when requested so to do during the times of depression and low value, but elected to continue the same in full force and effect and demanded the payments due thereunder; that said defendant because of the insistence of plaintiffs in holding the lease in full force and effect as aforesaid, and relying upon the promises of plaintiffs not to forfeit or cancel said lease, has, at great inconvenience and hardship to himself, paid to the plaintiffs large sums of money on account of said lease, to wit, more than $30,000, which said payments of money have been by plaintiffs accepted as payments on account of said lease, and said lease has been treated by plaintiffs and this defendant mutually at all times prior to the commencement of this suit as in full force and effect and partly executed, and plaintiffs have encouraged defendant to believe that the express terms of said lease were waived, and that defendant would be protected in his interest in the premises, and defendant avers that it would be grossly inequitable to permit plaintiffs to recover any advantage by this suit or to deprive defendant of any right in the premises, and plaintiffs ought to be and are estopped from asserting any forfeiture of cancellation of said lease or taking any advantage in the premises.

"(16) The defendant W. D. Wood alleges that by reason of the fault of the plaintiffs as to delivery of possession of said premises, as is hereinbefore more particularly set forth, and by reason of the acquiescence of plaintiffs in the continuation of said lease and the waiver of its exact performance as to time of performance, and by reason of the other acts aforesaid by plaintiffs and defendant, herein more particularly set forth, that said defendant is clear and free of any default or breach of covenant under said lease as to the payment of rent or as to the payment of taxes or. assessments or as to the beginning the construction of a building or buildings on said premises or as to breach of any other requirement or covenant under said lease, and defendant Wood alleges that the sums paid to plaintiffs were paid by him and accepted by the plaintiffs under the express understanding and agreement that defendant was not able to proceed under the provisions of said lease, but was, as aforesaid, in embarrassed circumstances financially, and that, by reason of said partial payments, the strict terms of said lease were abrogated as to time of performance, and defendant would be permitted to take up the performance under said lease after he was relieved of the immediate pressure upon him by reason of the general financial stringency and the construction of the said Olds, Wortman & King Building. And the defendant W. D. Wood avers that he is now ready, willing, able, and anxious to proceed under and in accordance with the terms of said lease and with due and reasonable promptness to comply with all of the provisions and requirements of the said lease, provided the unqualified and unlimited possession of the said premises be delivered to him.

"(17) The defendant W. D. Wood further avers that he is ready, willing, and able and will abide by any decree made by this honorable court as to any sum or sums due from him to the plaintiffs herein on account of or because of any sums which may be due, owing, and payable from him to the plaintiffs or to either of them, or any other act or thing which this court may decree he ought to do or perform, and defendant Wood avers that it would be grossly inequitable to permit the plaintiffs to cancel said lease and refuse to permit defendant to perform thereunder, at the same time to forfeit and re-

tain the said moneys, to wit, $————, paid to plaintiffs by defendant in performance of said lease and accepted by plaintiffs as aforesaid."

Williams, Wood & Linthicum and C. E. S. Wood, all of Portland, Or., for appellants.

Cake & Cake and John T. McKee, all of Portland, Or., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). As will be seen from the bill, the object of the suit was to obtain a decree removing a cloud from the complainants' title by canceling the lease; the ground of the suit being the alleged fact that the complainants had theretofore unlawfully declared the lease forfeited by reason of the breach of its covenants and conditions by the lessee.

The real question in the case is whether the time for the performance of the covenants and conditions of the lease was extended by agreement of the parties. It is contended on the part of the appellants that this was effected at a meeting between the complainant Pittock and the defendant Wood and his associate in the enterprise, Hawley, held at Pittock's office in Portland on the 13th of May, 1909. The trial judge, in deciding the controversy in favor of the complainants, expressly stated that, while he had no doubt that Wood and Hawley "both intended to testify on the trial to what they understood to be the arrangement with the plaintiff," yet that he was constrained to find from the testimony of Pittock and his witness Price, and from the subsequent conduct of Wood and Hawley, that the latter were mistaken. Nor does the learned counsel for the appellants question the good faith and honesty of the complainant Pittock.

The case shows that the appellants were engaged in similar enterprises in a number of cities, necessarily involving the expenditure of large sums of money, and, among them, in the erection on a nearby block in the city of Portland of a large structure called the Olds, Wortman & King Building. At first they met the payments called for by the lease in question, but then the well-known money panic of 1907 came on, and they became unable to do so. Pittock became in urgent need of ready money, not on his own account, so far as appears, but in order to aid a brother who was in financial trouble in Pittsburg, Pa. So urgent were his needs in that regard that on the 19th day of April, 1909, he demanded a substantial payment on the amount then due under the lease, and threatened that, if the entire amount due was not paid by June 10, 1909, he would "consider the cancellation of the lease according to the terms of the same." It was that pressing demand that brought about the meeting of May 13, 1909. Pittock and Price testified positively that the latter was present at the meeting. Wood and Hawley denied that he was present on that occasion. Eliminating Price's testimony in corroboration of that of Pittock, and looking first at the version as given by Wood and Hawley of the understanding of the parties to the lease arrived at at that meeting, and at what led to the meeting, we find that in response to the demand and threat made by Pittock in his letter of April 19,

1909, Wood wrote him, under date May 7th of that year, a frank, manly letter, setting forth at length the utter impossibility of himself and his associates proceeding with the building provided for by the lease under the then conditions, and the impossibility of their making any part of the payments then due thereunder, and offering to consent to a cancellation of the lease, but upon the condition that Pittock would release them from all obligation for unpaid rental. It is true that such condition was not expressly stated in the letter of May 7, 1909, but that such was the effect of the proposal made by Wood in that letter is admitted by him in his testimony on the trial, where he was questioned and answered in respect to that matter as follows:

"Q. As a matter of fact, Mr. Wood, taking the letter of May 7th, and referring to your sentence in which you say, 'What is best for you at this time is best for us, Mr. Pittock, and we therefore acquiesce in your conclusion to cancel the lease,' that is based upon your being released from all obligation for unpaid rental? A. Yes; that was the thought we had there.

"Q. You never have made any agreement or never have suggested any cancellation of the lease excepting upon the basis of your being relieved from back rental? A. Except in one instance.

"Q. When was that? A. When you and I were discussing the bringing of this suit, about an hour before it was brought, * * * [which was on the 13th day of October, 1909]."

So that, according to Wood's own testimony, during the conversation had between the parties at the meeting of May 13, 1909, no suggestion was made on behalf of the lessee for the cancellation of the lease, except upon the basis of the lessee being relieved from all back rental. This is important to be remembered in considering the different versions of the conversation at that meeting given by the respective parties. At that time there was about $53,000 due from the lessee to Pittock, and, as has already been said, Pittock was then in urgent need of money in order to help his brother out of his financial troubles in Pittsburg. Not only was Pittock's testimony positive to the effect that he at all times refused to cancel the lease upon the condition suggested by Wood, but was also positive to the effect that at the meeting of May 13, 1909, he was insistent upon the prompt payment of the rentals that were due, explaining his necessity therefor, in respect to which he is corroborated by this testimony of Wood himself:

"Q. Did Mr. Pittock in the meeting of May 13th tell you why he was so desirous of getting money—getting cash payments? A. Yes; he did. He went over that very carefully.

"Q. And did he go into the question of the necessity of his helping his brother? A. Yes; he did. As a matter of fact he produced a schedule or memorandum of obligations which his brother had, which, as I remember, aggregated some $600,000. He went to his vault, or a case of some kind, and got the statement and laid it down on the table where we were talking, and he went over it in considerable detail, pointing out certain items, mentioning amounts on which he had already paid something, other items on which he would have to pay some by a certain date, and other items that could stand a while. He didn't go over all of the items, but I should think there were— my memory would say perhaps 20 items of those obligations on that schedule."

The contention on the part of the appellants is that at that meeting the understanding of the parties was that Pittock would, and thereupon did, give them an extension of nine months from that date with-

in which not only to commence the building **called** for by the lease, but also within which to make all payments due. Pittock testified that he at no time consented to vary the terms of the lease in any respect, and positively denied that he consented to any extension of time within which the money due should be paid. He also testified that while Wood and Hawley, at the meeting of May 13th, did not definitely fix any time, they said they thought they could make the payments within 60 days from that date, and that, not having done so, he waited until the 9th of August following before giving the notice hereinafter referred to. In support of their testimony that at the meeting of May 13, 1909, Pittock agreed that they should have nine months from that date within which not only to commence the building provided for by the lease, but also within which to pay the money due from them under the lease, Wood and Hawley testified, among other things, as here set forth. Having stated that he and Hawley had an extended interview with Pittock at the latter's office in Portland on May 13, 1909, Wood was questioned, and answered as follows:

"A. Mr. Hawley conducted the major portion of the conversation on our part. In fact. Mr. Hawley had assisted me in preparing the letter of May 7th in Seattle. And we told Mr. Pittock that we had come down to see him in relation to his letter of April 19th, and, in relation to our reply of May 7th, to go over the matter with him, and we went over with him again. We asked him if he had received the letter of May 7th and considered it, and he said that he had. We then took up the letter of May 7th, and went over again very thoroughly in quite an extended conversation the suggestions of that letter.

"Q. Excuse me a moment for interrupting you. You said you took up the letter of May 7th. Do you mean that you had it then and there before you? A. I am not clear as to that. I think I had my copy with me. I don't know whether we used the letter.

"Q. Then, you mean in the sense of 'took up' that you went into the subject? A. Yes; that we went into the substance of what was in issue there.

"Q. All right, go ahead. What I was trying to get at was I did not know but you had the actual physical letter there before you and went over it— each article. A. I am not clear as to that.

"Q. All right, go ahead. A. We told him that we had come to get a decision from him in relation to his letter of April 19th and upon the basis of our reply, having set before him in our letter frankly what the condition was, which we did again in our conversation. We told him in the conversation that we were not able to pay any more rental at that time, as called for by his letter of April 19th. We told him that we had the Olds, Wortman & King Building construction on hand that was taxing our attention and our resources at that time, and that we would not be able to proceed with the construction of the building on the Pittock block until we had practically completed the Olds, Wortman & King Building, which we told him would require nine months from that time to complete. And we told him we wanted to know what our program was in relation to that because it was hopeless for us to hold out to him that we could make earlier payments than we had said in the letter of May 7th, either of rent or of taxes or of the construction of the building. And we told him that we had come to accept his suggestion of a cancellation of the lease, and left the subject before him.

"Q. Then what did he say in answer to that? A. His answer was that he didn't desire to cancel the lease; that his chief desire was, on account of the requirements that were upon him, to get his payments upon the rent at the earliest date that they could be obtained, but he did not desire to cancel the lease, and preferred that we proceed under the lease upon the program that we had specified to him in the conversation and in the letter.

"Q. Did he say anything about what time he would expect payments to be made or what time of suspension would be given? A. Well, we told him that,

under the requirements that were upon us, we could not assure him of rental payments or of the beginning of construction until the completion of the Olds, Wortman & King Building, which we told him in the conversation would require about nine months. In response to that he declined to cancel the lease, but requested us—said that he desired us to proceed, and that he would wait for us and for our efforts on that plan or program.

"Q. Until the completion of the building? A. Yes.

"Q. Now, is there anything else that occurred at that time that you desire to state? A. There doesn't anything further occur to me now. The conversation occupied quite a little time.

"Q. Well, what was the next step in this case, or the next development? A. The next development was the notice of August 9th notifying us, notifying me that, unless payments were made within 60 days, the lease would be canceled.

"Q. That is this notice that has been introduced, signed by Mr. Pittock? A. Yes, sir."

Being questioned in respect to the same interview, Hawley testified as follows:

"A. I will endeavor to give the conversations or their purport as accurately as I can. Judge Wood and I called upon Mr. Pittock May 13th, and found him alone in his office, and Judge Wood took up with him very briefly the question of whether he had received this letter of May 7th or not, and whether he had considered it. He said that he had received it, and that he had read it and considered it. We then stated to him—I think I stated this portion of the conversation myself, perhaps—said to Mr. Pittock that I came there with Judge Wood as one of his associates that co-operated with him in the handling of enterprises of this kind, and that I had just come from New York a short time before that; and I thought it was due to Mr. Pittock to make clear, make perfectly clear to him the views of Judge Wood's associates as to the immediate position that he was in, and that his associate companies were in, with relation to the financing of the Pittock transaction. I pointed out to him that, notwithstanding a very stressed period of business, our various companies had succeeded in carrying on their various enterprises and that at great efforts, under the conditions, the Olds, Wortman & King matter had been carried on, which was a matter of very great advantage to him and his property because it was in close proximity to it. It would build value into it, and that altogether the effort and work that was being done was to his good, not to his harm. I explained to him that so far as Judge Wood's associates were concerned, so far as our associate companies, each one being a separate entity, were concerned, and so far as I was concerned, the strain of the panic had given us all we could do to carry the loads that we had, and that his suggestion of his cancellation of the lease (while it would work a great hardship on Judge Wood in the matter of direct loss of what he had applied to it) was a thing that, if he expected any payment at that time from Judge Wood through the support of his associates, that it was fair for me to make clear to him we could not get. There wasn't anything available, nor would it be immediately available. I pointed out to Mr. Pittock as clearly as I could that the undertakings that we had in hand would absorb all of our efforts, all of our financial strength, all of the strength of our connections, at least until we should have completed the Olds, Wortman & King Building, and, in the spirit of the letter and effort that Judge Wood had made, that I wanted to concur that it was the time for Mr. Pittock to make his decision, not June 10th, but then, as to whether he would elect to cancel the lease as he had said he would do, or whether he would grant sufficient extension so that the various enterprises in which we were interested could clear up their undertakings and be prepared to finance this transaction and carry it through. Mr. Pittock answered us that he didn't desire to cancel the lease, was satisfied to have it carried out, wanted it carried out, and he was in hopes that we would—that Judge Wood would be able to pay him promptly at that time. We answered him that that was impossible, or in the immediate future and emphasized the fact that all our associate companies, and efforts and resources were occupied and made it clear to him, I

thought, without doubt, that it was a question of his granting an extension until we should have completed the Olds, Wortman & King Building, which would be a great benefit to him, or canceling the lease. That there wasn't any halfway step that we would be able to accomplish: and I pointed out to him also that if he elected to have the lease continue, and asked us to try to carry it out, asked Judge Wood to go ahead with it, asked me to co-operate with him, that we would use our best endeavors, and I would use my best endeavors in all the connections that I had, and we would conserve our resources for that enterprise as soon as we had accomplished the Olds, Wortman & King transaction. And Mr. Pittock then told us that it was his desire and his election, after that frank statement of our abilities and inabilities, that we go ahead and endeavor to finance the transaction and build the building, and comply with the lease. And under that assurance from him, that express desire on his part that we should do so, I used my best endeavors after that time to prepare our various institutions, and to get our various connections interested in the subject and ready, when we were through with the Olds, Wortman & King matter, to take it up. I left Mr. Pittock's office with Judge Wood with the clear understanding that it was his distinct request and election that we should carry out the lease and that he would grant us the necessary extension to do it.

"Q. Was anything said at that time about when, definitely, you expected to have the Olds, Wortman & King business off your hands? A. Yes; that date we very carefully calculated. We knew that it would take us about nine months to complete it, and made that very clear to Mr. Pittock. He understood that that was what was before it, and that was my errand there, to make that clear to him, as one of the associates in the matter."

Not only is the claimed agreement on Pittock's part to extend for nine months the payment of the overdue money strenuously denied by him in his testimony, but we think it highly improbable that he would have made such an agreement in view of his then pressing need of the money, already alluded to. And the testimony above quoted of Wood and Hawley as to what occurred at the meeting in question is far from sustaining their contention. It is undoubtedly true, as shown by the testimony of all the parties to the conversation, that Pittock did not then wish to cancel the lease. and we are of the opinion from the record that he did at that meeting practically acquiesce in the postponement of the commencement of the building by the lessee for the nine months asked for that purpose; but that he did not consent to any such delay in the payment by the lessee of the money due under the lease.

In the testimony of Wood and Hawley as to what occurred in the meeting of May 13th, there is no statement that Pittock agreed to wait for nine months or any other definite time for the payment of the money due him, and there are implications to be drawn therefrom, to some extent at least, corroborating Pittock's testimony to the effect that they then said they thought they would be able to pay the money due within the 60 days from that time. Not having done so, Pittock gave the notice of August 9, 1909, to the effect that, unless the money was paid within the next 60 days, he would declare the lease forfeited, which he later did; such payment not having been made. The conclusion reached by the court below, and to which we have come after a careful consideration of the record, that Pittock did not make the agreement relied upon by the appellants, is sustained by the further facts shown by the record that, when the notice of August 9th was received by Wood, the latter made no contention that a for-

feiture for the nonpayment of the money due would be in violation of a previous agreement for the extension of such payment, nor when notified in October, 1909, by Pittock's secretary, the witness Price, that he had positive instructions to commence suit if the rent was not paid by October 10th, did the defendant claim that there was any agreement for the extension of the time for such payment, although he did protest against the bringing of such suit on the ground that it would do the complainant no good and prevent the defendant from proceeding under the lease, and injuriously affect the work then being carried on by the defendant in Portland.

The present not being a suit to declare a forfeiture, the other question argued by counsel does not arise.

The judgment is affirmed.